UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| MILTON LUSTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-1114 |
| ) | |
| ILLINOIS DEPARTMENT OF CORRECTIONS, ) | |
| ) | |
| Defendant. ) | |

## ORDER

This matter is now before the court on Defendant, Illinois Department of Corrections (IDOC's), Motion for Summary Judgment. For the reasons set forth below, the Motion for Summary Judgment [#39] is GRANTED.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims asserted in the Complaint present federal questions under Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII").

## FACTUAL BACKGROUND

Plaintiff, Milton Luster ("Luster") is an African-American male. On August 8, 1988, Defendant, the Illinois Department of Corrections ("IDOC"), hired Luster as a Correctional Officer at the Joliet Correctional Center. Between 1999 and 2001, Luster was promoted multiple times and transferred to multiple locations, from Correctional Officer to Correctional Sergeant at Robinson Correctional Center, to Correctional Lieutenant at Decatur Correctional Center, and finally to Correctional Captain at Dwight Correctional Center ("DCC"). In 2003, the position of Correctional Captain was eliminated, and Luster was returned to the position of Correctional

Lieutenant. At the time relevant to this action, Luster held the position of Correctional Lieutenant at DCC; Mary Sigler ("Sigler") was Warden at DCC; and Pamela Harris ("Harris") was Assistant Warden at DCC.

On June 6, 2006, Luster wrote an incident report alleging that Christina Cole ("Cole"), a white female Correctional Officer, was insubordinate and called him a "bitch" during a conversation earlier that day. On June 9, 2006, Cole wrote an incident report in which she alleged Luster repeatedly harassed her between May 25, 2006 and June 6, 2006. Cole specifically alleged that that on approximately June 1, 2006, Luster pinned her in the unit C-15 control panel at Dwight Correctional Center and put "hickeys" on her neck.  Ex. 4, Def. Mem. Supp. Summ. J. Cole stated that Correctional Officers Heather Jordan ("Jordan"), a white female, and Kenneth Donnals ("Donnals"), a white male, witnessed part of this incident. Luster was placed on paid administrative leave on June 11, 2006.

Larry Sims ("Sims"), an investigator with the IDOC investigations unit, was assigned to probe Cole's allegations against Luster.  After Sims concluded his investigation and found that the charges against Luster were substantiated, a hearing was held on August 7, 2006 before Employee Review Officer Janice Emm ("Emm"). On August 17, 2006, after considering the information and documentation presented at the hearing, Emm issued a recommendation that IDOC terminate Luster's employment. This recommendation was supported by Warden Sigler, and Luster was suspended pending discharge effective August 31, 2006.  Ex. 12, Def. Mem. Supp. Summ. J.  However, Luster testified that the letter he received from the IDOC stated that his punishment was a "30-day termination." Luster Dep. 110: 20-23. On September 6, 2006, Luster tendered his resignation to Sigler.

Luster commenced this action on February 8, 2008, subsequently amending the initial Complaint to allege racial discrimination in violation of Title VII (Count I), racial and sex discrimination in violation of § 1983 (Count II), violation of his First Amendment right to free speech (Count III), violation of his Fourteenth Amendment rights to equal protection (Count IV) and due process (Count V), and retaliation on the basis of race in violation of Title VII (Count VI). This Court dismissed Counts II – VI in an order entered December 11, 2008. Defendant submitted its Motion for Summary Judgment on the only remaining Count, racial discrimination in violation of Title VII, on October 1, 2009. This matter is now fully briefed, and this Order follows.

## STANDARD OF REVIEW

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must demonstrate, through portions of the record or affidavits, the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record

and all references drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).  The Court will deny summary judgment if a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

## DISCUSSION

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 63 (1986).  Under Title VII, a plaintiff is required to establish that he has been the victim of intentional discrimination. Rhodes v. Ill. Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004). The plaintiff may prove intentional discrimination using the "direct method" or the "indirect method". *Id.*

When pursuing a claim using the direct method, the plaintiff may present either direct or circumstantial evidence. Jordan v. City of Gary, Ind., 396 F.3d 825, 832 (7th Cir. 2005). Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000). However, such admissions are rarely made or encountered in today's workplace environment. *See* Jordan 396 F.3d at 832.  As a result, plaintiffs are also allowed to use circumstantial evidence to present a "convincing mosaic" that "allows a jury to infer intentional discrimination by the decision maker." Rhodes, 359 F.3d at 504 (quoting Troupe v. May Dept. Stores Co., 20 F.3d 734, 737 (7th Cir. 1994)).  Luster makes no attempt to show discrimination via the direct method, thus, the Court must evaluate his claim under the indirect, burden-shifting, method of

4

proof. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Caskey v. Colgate-Palmolive Co., 535 F.3d 585, 591-592 (7th Cir. 2008).

Under the McDonnell Douglas indirect method, the plaintiff carries the initial burden of establishing a prima facie case of discrimination by showing: 1) he was a member of a protected class; 2) he was meeting his employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. Winsley v. Cook County 563 F.3d 598, 604 (7th Cir. 2009); Caskey, 535 F.3d at 592. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse employment action. Fane v. Locke Reyolds LLP., 480 F.3d 534, 538 (7th Cir. 2007) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). If the defendant succeeds, then the burden shifts back to the plaintiff to show that the defendant's reasons are pretextual. Perez v. Illinois, 488 F.3d 773, 776 (7th Cir. 2007).

**I. Prima Facie Case**

Of the four elements necessary to prove a prima facie case of discrimination, only the fourth prong, whether similarly situated employees received more favorable treatment, is truly in dispute. The parties do not dispute that Luster, an African-American male, is a member of a protected class. Additionally, the record clearly shows that Luster suffered an adverse employment action, as he was suspended pending discharge effective August 31, 2006. Ex. 12, Def. Mem. Supp. Summ. J. Finally, in discriminatory discipline cases, the second prong, whether the plaintiff met the employer's legitimate expectations, merges with the fourth prong. Caskey, 535 F.3d at 592.

In considering whether similarly situated employees received more favorable treatment, the Court is mindful that this requirement "should not be applied mechanically or inflexibly". Humphries v. CBOCS West, Inc., 474 F.3d 387, 404 (7th Cir. 2007). To prove this element, a plaintiff must establish that the other employees were "similarly situated with respect to performance, qualifications, and conduct." Keri v. Board of Trustees of Purdue University, 458 F.3d 620, 644 (7th Cir. 2006) (citation omitted). The similarly situated analysis "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Humphries, 474 F.3d at 404-5 (quoting Radue 219 F.3d at 617-18); *see also* South v. Illinois Environmental Protection Agency, 495 F.3d 747, 752 (7th Cir. 2007); Keri, 458 F.3d at 644. This inquiry "simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow… a jury to reach an inference of discrimination." Humphries, 474 F.3d at 405. The plaintiff "need not *prove* anything at this stage." *Id* (emphasis in original).

Luster believes numerous IDOC employees were similarly situated, yet received more favorable treatment. Correctional Officer Donald Kinsella ("Kinsella"), a white male, was alleged to have "socialized with an inmate." Sigler-Quigley Aff. ¶ 7. Warden Sigler recommended a seven-day suspension for Kinsella because she determined that the charge against him was not proven. *Id* at ¶ 9. Correctional Officer Kenneth Kozlowski, a white male, allegedly touched the breast of a female correctional officer. *Id* at ¶ 14. Warden Sigler recommended that Kozlowski be discharged from employment. *Id* at ¶ 15. Correctional Officer Heather Jordan, a white female, allegedly engaged in unprofessional conduct toward a superior

officer. *Id* at ¶ 19.  Warden Sigler recommended that Jordan receive a seven-day suspension. *Id* at ¶ 20. Correctional Officer Michael Strowmatt, a white male, faced allegations of engaging in five counts of custodial sexual misconduct. *Id* at ¶ 12.  He was arrested by the Livingston County Sheriff's Dept. and resigned prior to having an Employee Review Hearing. *Id* at ¶ 13. Lieutenant Bill Hurley, a white male, faced allegations of unprofessional conduct following allegations that he struck an officer with a telephone. Hurley Aff. at ¶ 7.  Hurley received a three-day suspension under Warden Lynn Cahill-Mashing. *Id* at ¶¶ 10, 12.  Finally, Lieutenant Donald Johnson allegedly touched a correctional officer in an inappropriate manner. Johnson Aff. ¶ 4. He was placed on suspension pending judicial verdict by then-Warden Alyssa B. Williams. *Id* at ¶ 5.

    Understanding the role of the Warden is key to an accurate analysis of whether IDOC employees were similarly situated.  The responsibilities of a Warden include reviewing disciplinary actions and recommending "a level of discipline" for each employee. Sigler-Quigley Aff. ¶ 3.  Following the Employee Review Hearing, the Warden has discretionary power to either agree or disagree with the decision of the Hearing Officer and increase or decrease the discipline levied. Harris Decl. ¶ 23.[1]  In August 2006, Warden Sigler recommended that Luster be discharged from employment with the IDOC because she found the allegations against him were substantiated.  Although they had different ranks and supervisors, Correctional Officers Kinsella, Kozlowski, Jordan, and Strowmatt were all ultimately subject to Warden Sigler's disciplinary recommendations for their actions. This commonality is sufficient to support a comparison between the disciplinary actions levied against Luster and those recommended and implemented for the Correctional Officers listed.  Conversely, Lieutenants Hurley and Johnson, although

---

[1] Defendant challenges the admissibility of the Harris Declaration because it was not notarized and does not indicate that the statements were made under oath.  However, because the declaration was made "under the penalty of perjury," signed, and dated, it complies with the requirements of 28 USCS §1746 and is admissible.

7

sharing the same rank with Luster, were disciplined by different Wardens, whose judgment in evaluating the situations before them would naturally vary. As a result, they are not sufficiently similar to Luster for the purposes of this analysis.

Based upon the evidence submitted, a genuine issue of fact exists concerning the similarity of conduct among three of the remaining comparable employees and Luster. The parties do not dispute that Kozlowski allegedly touched a female officer's breast and Officer Strowmatt allegedly engaged in sexual misconduct with an offender. Aff. Sigler-Quigley ¶¶ 7, 12. The facts surrounding Officer Kinsella's actions, however, are in dispute. Luster stated that Kinsella was accused of giving his telephone number to an inmate and having sex with an offender. Luster Dep. 33: 4-8; Pl. Answer to Interrog. 18. Sigler contradicts this statement and asserts that Kinsella was not charged with engaging in sexual contact with an offender. Sigler-Quigley Aff. ¶ 8. This disagreement is a factual dispute, properly resolved before a trier-of-fact and not on summary judgment. The IDOC has at its disposal both incident reports and employee review memoranda which would have provided clear documentation of the allegations Officer Kinsella faced and the nature of the conduct for which he was disciplined. Thus, it is surprising that the Defendant would instead choose to rely on the testimony of a witness, evidence which has been contested by the conflicting memory of another. However, because all issues of fact are to be construed in a light most favorable to the non-movant, Plaintiff's characterization of Kinsella's accused behavior is sufficient to find that the conduct underlying the accusations against both Luster and Kinsella are similar in nature.

While the exact actions of the officers are not identical, the allegations against Officers Kinsella, Kozlowski, and Strowmatt all involved inappropriate touching of a sexual nature. Thus, the alleged conduct of the three officers is sufficiently comparable to Luster's alleged conduct to

8

survive the prima facie analysis. *See* Humpries, 474 F.3d at (noting that the similarly situated inquiry is "not an unyielding, inflexible requirement that requires near one-to-one mapping between employees-distinctions").

Only Officer Jordan's conduct is markedly different in nature as compared to Luster's alleged conduct. Jordan allegedly acted disrespectfully toward a Major and made unprofessional radio calls about that Major to other staff. Sigler-Quigley Aff. ¶ 19. Making unprofessional calls and acting in a disrespectful manner are different in nature than pinning someone and giving them "hickies". Thus, Jordan is not similarly situated to Luster for the purposes of this analysis.

Of the three remaining employees, only Officer Kinsella survives the mitigating circumstance analysis. As discussed above, the record contains conflicting statements regarding Kinsella's alleged conduct. The Court cannot resolve a dispute of material fact on this issue.

Conversely, Officer Strowmatt and Officer Kozlowski's situations both include a mitigating circumstance which sufficiently distinguishes each example from Luster's. Specifically, Strowmatt resigned prior to his Employee Review Hearing. Sigler-Quigley Aff. ¶ 13. As a result, Warden Sigler never officially recommended punishment for Strowmatt's alleged actions. Although, according to Plaintiff, Strowmatt was placed on administrative leave "after the investigation," the adverse employment action challenged here involves Luster's discharge from employment. Pl. Answer to Interrog. 18. Paid administrative leave pending the conclusion of an investigation is not a materially adverse action. Nichols v. Southern Ill. Univ.-Edwardsville, 510 F.3d 772, 786-787 (7th Cir. 2007).

Officer Kozlowski's situation also involves a mitigating circumstance. Upon consideration of Kozlowski's charged conduct (touching the breast of a female officer), Warden Sigler recommended that Kozlowski be discharged. Sigler-Quigley Aff. ¶ 15. She made the same

9

recommendation after evaluating the charges against Plaintiff. Luster contends that Kozlowski received differential treatment because Kozlowski was not actually discharged from employment with the IDOC. Kozlowski, however, utilized the grievance procedures available to IDOC employees and was allowed to return to his job, notwithstanding Warden Sigler's disciplinary recommendations. *Id* at 16.

Here, Luster did not appeal Warden Sigler's decision through a grievance procedure despite the fact that Luster previously pursued a grievance during his time at Robinson Correctional Center and successfully received a reduction in discipline. Luster Dep. 97:6-11:

> "Q: Did you grieve your termination?
>
> A: No.
>
> Q: Why not?
>
> A: I really didn't know what to expect from the union, because they'd never handled a grievance from me before."

*Id* at 99:17 – 100:4:

> "Q: Had you ever pursued a grievance to arbitration before?
>
> A: I would like to think that at Robinson we won some days back that I had with Bastian and Sue Sanders down there, Officer Sanders.
>
> Q: So in that instance, you remember your discipline being reduced through the grievance process?
>
> A: That's correct.
>
> Q: But you didn't pursue that process with regard to your termination?

A: That's correct"

Luster presents the example of Office Kozlowski's reinstatement as evidence of discriminatory practices; however, Kozlowski received the same disciplinary decision from the Warden as Luster, but then went on to utilize all of the weapons available to him to challenge his termination. Luster knew that he could have challenged his termination through the union grievance process, yet he chose not to pursue that option. *Id* at 107:21- 108:10:

> "Q: So it's your allegation that being—when you're terminated from the Department of Corrections, you don't have any rights to a grievance?
>
> A: You have rights to a grievance, but it's a slower process. To my understanding, usually when they give you—if they do an emergency fourth level grievance, that's—if someone is getting fired, that gives them a chance to fight to get the days reduced.
>
> Q: But you still could have pursued the grievance process even though you were terminated?
>
> A: Through the union?
>
> Q: Yes.
>
> A: Yes"

Luster can identify one IDOC employee that is arguably similarly situated, Officer Donald Kinsella. Such a showing is sufficient to establish a prima facie case.

### II. Legitimate Non-Discriminatory Reason

The burden now shifts to the Defendant to show a legitimate non-discriminatory reason for Luster's termination. Fane, 480 F.3d at 538. The IDOC launched an internal investigation and

conducted an Employee Review Hearing to review the serious charges of misconduct levied against Luster. The IDOC maintains that Luster was discharged because the agency found that these charges were substantiated and Luster violated the department's rules of conduct.  Such reasoning is a legitimate and proper basis for firing an employee and is also non-discriminatory.

**III.  Pretext**

Because the IDOC has proffered a legitimate, non-discriminatory reason for its action, Luster must now demonstrate that this reason was mere pretext for discrimination. Reeves, 530 U.S. at 143.  The pretext inquiry is focused on "whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered". Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000). As a result, the pretext question before the Court "is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the state reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason." Forrester v. Rauland-Borg Corp., 453 F.3d 416, 418 (7th Cir. 2006) (emphasis in the original).  In order to show pretext, "a plaintiff must show that (a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent". Perez, 488 F.3d at 777.

The IDOC discharged Luster for violations of department rules of conduct. Ex. 11, Pl. Mem. Opp'n. Summ. J. Luster believes that this stated reason was dishonest and merely "a cover up designed to quiet officer Cole's allegations that she was physically attacked by a black officer who put hickies on her neck," because "the decision to terminate Lt. Luster was racially motivated".  Pl. Mem. Opp'n. Summ. J. at 15.  In order to prove that the stated reason was dishonest, Luster must present direct evidence of pretext or indirect evidence showing that the IDOC's "reason is not credible or that the reason is factually baseless." Perez, 488 F.3d at 777

12

(citing Guerror v. Ashcroft, 253 F.3d 309, 313 (7th Cir. 2001)). Luster highlights inconsistencies, omissions, and errors over the course of the IDOC's two month disciplinary investigation in his effort to show that the IDOC's reasoning was not credible and/or was factually baseless, and thus pretextual.

Luster's allegations are not completely frivolous. For example, Sims, the external investigator, admits that he found some of the testimony given by one of the witnesses to be "suspicious," failed to investigate whether the incident could have occurred in the manner that Cole asserted given the layout of the room, and never inspected the Sign-In/Log Book to find out if Luster was present on the dates of the alleged conduct. Sims Dep. 29:18- 30:2; 62: 5- 63: 10; 63: 15- 65: 14. Additionally, Luster correctly calls into question the fairness of a procedural practice that allows the Warden to choose a person to act as the Hearing Officer and also tell that person "what discipline that [the Warden] wanted the [accused] individual to receive". Harris Decl. ¶ 23.

Luster's concerns about the IDOC investigatory process may be legitimate; however, this Court is not a "super personnel department." Millbrook v. IBP, Inc., 280 F.3d 1169, 1181 (7th Cir. 2002). Even if the Court would have come to a different conclusion based on the same information, an action supported by insufficient facts is not equivalent to a factually *baseless* action. Stated differently, the IDOC may have been "…cruel, unethical… or downright irrational in taking the action," but the Court is only concerned with "whether the stated reason *was* [the employer's] reason: not a good reason, but the true reason." Forrester, 453 F.3d at 418 (emphasis in original).

The IDOC discharged Luster after conducting an employee review hearing. Janice Emm, the Hearing Officer, considered the Sims investigative report along with statements given by

Luster, Cole, and two witnesses, and concluded that the charges against Luster were substantiated. Ex 11, Pl. Mem. Opp'n. Summ. J.  Both Larry Sims, the external investigator, and Emm, the Hearing Officer, evaluated the credibility of the statements and came to the conclusion that Luster was guilty of the alleged conduct. Although Luster vehemently argues that both Sims and Emm reached the wrong conclusion, the record does not show that their beliefs were not honestly held. The testimony of witnesses provides a legitimate factual basis upon which an employer may reasonably find that an employee violated the code of conduct. Further, Luster admits that the Sign In/Log Book that Sims failed to examine during his investigation shows that Luster was, in fact, present at the facility on June 1, 2006, the day of the incident which Jordan and Donnals witnessed. Luster Dep. 106: 14-17. As a result, although Luster may have legitimate concerns about the investigatory process, these flaws do not render the IDOC's stated reasons for Luster's discharge (violations of the department rules of conduct) so weak, implausible, or contradictory that "a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." Boumehdi, 489 F.3d 781, 792 (7th Cir. 2007).

Luster asserts that he was discharged because management was under pressure due to "assault allegations by a white female officer against a black male officer [which] would cause problems for the Department or Dwight itself." Pl. Mem. Opp'n. Summ. J. at 15.  Luster offers statements made by his union representative, Lieutenant Glen Davidson, and Superintendant Duane Tucker as evidence that the IDOC made the decision to terminate Luster before the completion of the internal investigation and before the employee review hearing. According to Luster, Lieutenant Davidson told him that Emm, the Hearing Officer, "already got her mind made up" and that "this is a done deal".  However, Plaintiff testified that he never asked

14

Davidson to explain the basis of his beliefs nor did Davidson indicate that the basis of his opinion arises from racial or gender biases held by Emm. Luster Dep. 115: 15– 21:

> "Q: Did he say why she had her mind made up or just that she had her mind made up?
>
> A: I don't think I ever asked him.
>
> Q: He didn't say she has her mind made up because she's biased against you because of race or because of gender or anything like that?
>
> A: No, he didn't say."

Luster has not offered any testimony or documentation which indicates that Luster's hearing was a "done deal" as a result of any racial or gender bias on the part of the hearing officer. Without any factual basis explaining the origin of the belief, these statements are merely Davidson's opinions about Emm's mindset and are not probative of whether Emm entered Luster's hearing with her "mind made up" or whether she was motivated by a discriminatory intent.

     Similar problems undercut the probative nature of comments made by Superintendant Duane Tucker.  Luster submitted a declaration written by Pamela Harris, Assistant Warden at Dwight Correctional Center during the alleged incidents, in which she recalls a conversation with Superintendant Duane Tucker that occurred shortly after Luster was placed on paid administrative leave.  During the conversation, Tucker stated that "they were going to 'get' Lieutenant Luster or they 'got him now'".  Harris Decl. ¶ 18.  Plaintiff fails to contextualize Tucker's role, if any, in the chain of command responsible for the levying Luster's disciplinary judgment. As a result, the Court is left to speculate as to whether Tucker is speaking from a position of influence, as someone directly involved in the disciplinary proceedings, or is simply relaying his opinion on the probable outcome of the Sims investigation and Employee Review

Hearing. When viewed in the light most favorable to the Plaintiff, the nonmoving party, Superintendent Tucker's comment is clearly an indictment on the fairness of the process afforded Luster. However, even under the favorable summary judgment standard, the evidence does not indicate that racial or gender discrimination was the reason "they" were out to "get" Luster. Even if this statement points to dishonesty or lack of credibility in the IDOC investigatory process, it does not show that "the employer's true reason was based on a discriminatory intent" and the Defendant's actions were pretextual. Perez, 488 F.3d at 777.

Luster has primarily presented evidence which calls into question whether the IDOC's stated reasoning was "accurate, wise, or well-considered," not whether it was honest. Stewart, 207 F.3d at 378. The only evidence which relates to the honesty of the investigation, Superintendant Tucker's comment to Assistant Warden Harris, does not indicate any racial or gender bias. As a result, Luster has failed to show that the IDOC's reason for terminating his employment was pretextual.

**IV. Cat's Paw Theory**

Luster posits the "cat's paw theory" as an alternative basis for finding that his dismissal was the result of racial discrimination. Under the cat's paw theory, when an employee "without formal authority to materially alter the terms and conditions of a plaintiff's employment" exerts a "singular influence" over the decision-maker behind the adverse action, the employee's actions "are imputed to the employer and the employer is in violation of Title VII." Brewer v. Board of Trustees of Univ. of IL., 479 F.3d 908, 917 (7th Cir. 2007) (citing Rozskowiak v. Village of Arlington Heights, 415 F.3d 608, 613 (7th Cir. 2005)). An employee possesses a "singular influence" when she possesses "so much influence as to basically be herself the true 'functional… decision-maker," and thus renders the official decision-maker behind the adverse

action nominal in nature. Brewer, 479 F.3d at 917 (quoting Little v. Ill. Dept. of Revenue, 369 F.3d 1007, 1015 (7th Cir. 2004)). The cat's paw theory is not applicable, however, "where a decision maker is not wholly dependant on a single source of information, but instead conducts its own investigation into the facts relevant to the decision…" Staub v. Proctor Hosp., 560 F.3d 647, 656 (7th Cir. 2009) (quoting Brewer, 479 F.3d at 918).

Luster asserts that Officer Cole used Investigator Sims, Warden Sigler and Hearing Officer Emm as her "cat's paw" to take adverse action against Luster. Luster claims that the decision to discharge him came from a blind reliance on Cole's false allegations. However, the record clearly shows that Emm, the decision-maker behind Luster's discharge, was not wholly dependant on a single source of information. In the text of her recommendation, Emm stated that she considered "the information, documentation, and statements presented during the hearing," including a review of the Sims investigative report and "the statements given by all employees." Ex. 11, Def. Mem. Supp. Summ. J.  Emm specifically referenced the Union's statement, Luster's statement, and the eyewitness accounts given by Officer Donnals and Officer Jordan during her discussion of Luster's disciplinary recommendation. *Id.*  In cases where an employee claims he was "framed for misconduct by a racist coworker or superior," the employer "will not be liable for the racism of the alleged frame-up artist so long as it independently considers both stories." Brewer, 479 F.3d at 918 (citing Lucas v. Chicago Transit Authority, 367 F.3d 714, 730 (7th Cir. 2004)) (other citations omitted). The record shows that Emm independently weighed the credibility of numerous testimonial statements, including the Defendant's, and reached her own conclusion on the appropriate disciplinary action.  The record clearly establishes that Emm considered both sides of the story (Luster's statement as well as statements by Donnals and

17

Jordan) and was not reliant on a singular source of information in determining the appropriate disciplinary action against Luster.

In short, Luster has not submitted any evidence, beyond his own speculative commentary, establishing that Officer Cole exerted a singular, controlling influence over Emm, rendering Emm merely a nominal decision-maker who blindly implemented the disciplinary recommendation of a racist employee. Luster, thus, cannot recover under the cat's paw theory, and the IDOC's request for summary judgment is therefore granted.

## CONCLUSION

For the foregoing reasons, the Illinois Department of Corrections' Motion for Summary Judgment [#39] is GRANTED. This matter is now TERMINATED.

ENTERED this 4th day of December, 2009.

s/ Michael M. Mihm  
Michael M. Mihm  
United States District Judge
